UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| In re: | |
| SUPERIOR STAR, LLC | Case No. 26-31809-crm |
| Debtor | Chapter 11 |

**DECLARATION OF BRIAN BONFIGLIO
IN SUPPORT OF FIRST DAY MOTIONS**

I, Brian Bonfiglio, hereby declare under penalty of perjury of the laws of the United States of America, as follows:

1.      I am an adult resident of Maricopa County, Arizona.

2.      I am the Chief Executive Officer of Superior Star, LLC ("Debtor"), debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case.

3.      I am authorized and competent to make this declaration in support of the Debtor's "first day motions" identified below.[1]

4.      The statements contained herein are accurate to the best of my knowledge and, unless otherwise indicated, are based upon my personal knowledge. Any legal conclusions contained herein are made based upon my understanding of the law and pertinent circumstances.

5.      I have read and am familiar with the Debtor's:

a.      *Motion for Interim and Final Orders Authorizing the Use of Cash Claimed as Collateral and to Determine that Certain Post-Petition Revenues are Not Cash Collateral*

---

[1] Unless otherwise indicated, capitalized terms used herein shall have the meanings given to them in the First Day Motions.

1

4430139.1

("Cash Collateral Motion");

b.    *Motion to Approve Cash Management System and the Continued Use of Pre-Petition Bank Accounts* ("Cash Management Motion");

c.    *Motion for Order Authorizing the Debtor to Pay Pre-Petition Wages and Honor Pre-Petition Benefit Obligations* ("Wage Motion");

d.    *Motion to Authorize Payment of Pre-Petition Claims of Critical Vendors and for Authority to Use Operating Revenues to Pay Such Critical Vendors* ("Critical Vendor Motion");

e.    *Motion to Determine Adequate Assurance of Utilities and to Establish Procedures for the Resolution of Related Disputes* ("Utilities Motion"); and

f.    *Omnibus Motion To Reject Certain Unexpired Real Property Leases And The Franchise Agreements Relating To Such Locations* ("Lease Rejection Motion").

6.    The foregoing motions are referred to herein as the "First Day Motions."

**General Background**

7.    The Debtor, as franchisee, operates fifty-nine "Hardee's" quick-service restaurants (each a "Restaurant," and collectively, the "Restaurants") dispersed across ten states.

8.    Fourteen of the Restaurants are located within the Western District of Kentucky, which is more than any other district.

9.    In 2025, through operation of the Restaurants, the Debtor generated approximately $80,000,000 in gross revenue.

10.    Despite its demonstrated ability to generate revenue, the Debtor has continually struggled against unforeseen and uncontrollable circumstances, which have

2

4430139.1

prevented the Debtor from achieving consistent profitability.

11.    The Debtor purchased the Restaurants in 2023 for approximately $13,000,000. In addition to the purchase price, at closing, the Debtor's principals infused $4,000,000 to improve and support the Restaurants' operations. Additionally, the Debtor's principals have contributed an additional approximately $2.0 million to the Debtor over the past two and a half years, including a recent contribution of $300,000 to ensure that payroll would be made to employees.

12.    Due to various omissions and/or misrepresentations by the seller, almost immediately after acquisition of the Restaurants, the Debtor was forced to absorb extensive and unforeseen deferred maintenance and repair expenses, unpaid taxes, and other latent liabilities.

13.    These unexpected expenses aggregated to millions of dollars, and deprived the Debtor of cash flow that would otherwise be available to meet debt obligations or improve operations.

14.    The aged physical facilities in which the Restaurants were operating not only gave rise to the expenses discussed above, but also suppressed demand by creating an unattractive invitation to potential customers.

15.    Reduced demand, coupled with industry-wide increases in food costs, severely strained the Debtor's ability to generate a profit.

16.    Accordingly, prior to the Petition Date, the Debtor closed several under-performing stores and/or terminated certain leases and franchises related to those stores. Those closures and terminations saved the Debtor substantial expenses; however, with respect to some of the closed stores, the Debtor entered into agreements with the landlords and

4430139.1

franchisor to continue paying rent. These "dark site" expenses are substantial and the Debtor intends to reject those agreements to further reduce its expenses.

17. The Debtor also became delinquent in its payment of some state sales taxes in certain locations that resulted in the taxing authorities unexpectedly levying the Debtor's bank accounts. These tax levies caused a severe strain on the Debtor's cash flows.

18. All of these challenges, when combined, created the necessity of these bankruptcy proceedings to restructure the Debtor's operations and liabilities, so that it can preserve its business for the benefit of all parties-in-interest.

19. The tax levies, in particular, precipitated the timing of the bankruptcy filing.

20. The Debtor believes that, through a reorganization that addresses the claims and liabilities of its franchisor and the entity from which the Restaurants were acquired, the Debtor can emerge as an operationally and financially durable enterprise, with the ability to employ people, pay taxes, and otherwise be a productive corporate citizen for years to come.

**Pertinent Facts Relating to the Cash Collateral Motion**

21. In order to preserve its operations and enhance the value of its bankruptcy estate during these bankruptcy proceedings, the Debtor must use its cash-on-hand and the income derived from post-petition operations to pay, among other things, the expenses associated with staffing, stocking, and operating the Restaurants, along with other ordinary and necessary operating expenses.

22. The projected income (the "Income") and expenses (the "Expenses"), for the period of July 7, 2026 through October 5, 2026, are identified in the budget attached to the Cash Collateral Motion as Exhibit "A" (the "Budget").

23. Upon information and belief, based upon pre-petition agreements and UCC-1

4430139.1

financing statements, the Debtor believes that Western Alliance Bank (the "Bank") asserts a security interest in the Debtor's cash, inventory, and/or accounts, and contends that the Debtor's cash-on-hand and/or Income constitutes "cash collateral" as defined in § 363 of the Bankruptcy Code.

24.    The Debtor has not yet had sufficient time to determine whether any party, other than the Bank, may assert a security interest in the Debtor's cash, inventory, and/or accounts, and contend that the Debtor's cash-on-hand and/or Income constitutes "cash collateral" as defined in § 363.

25.    The validity, priority, enforceability, or extent of any lien asserted by the Bank or any other creditor will be analyzed by the Debtor within these bankruptcy proceedings, and the Debtor expressly reserves the right to contest any such lien or otherwise object to the claim related thereto.

26.    In the meantime, the Debtor proposes to use its cash and the Income to pay the Expenses in accordance with the Budget, with a ten percent (10%) permissible variance of the total of each Budget.

27.    It is crucial for the Debtor to have the use of its cash and the Income to maintain the operation of its businesses in order to enhance and preserve its going-concern value while the Debtor formulates and implements a plan of reorganization.

28.    The Debtor believes that its reorganization efforts would suffer immediate and irreparable harm if the Debtor were not allowed to use its cash and the Income to pay the Expenses.

29.    The Debtor submits that any purported interests in its cash and the Income are adequately protected by the value generated through the Debtor's future operations.

4430139.1

30.     Moreover, as additional protection, the Debtor is willing to provide to any creditor which is ultimately concluded to have an interest in cash collateral a replacement lien in the post-petition assets of the Debtor, to the extent, and with the same validity and priority, as existed prior to the Petition Date.

**Pertinent Facts Relating to the Cash Management Motion**

31.     In the ordinary course of the Debtor's business, each Restaurant maintains a single, separate bank account, into which all of its receipts are deposited (the "Restaurant Accounts"). A schedule identifying each of the Restaurant Accounts is attached to the Cash Management Motion as Exhibit "A."

32.     Prior to the Petition Date, the funds in the Restaurant Accounts were periodically swept into an account maintained by the Debtor (the "Pre-Petition Sweep Account") at Western Alliance Bank (the "Bank").

33.     All of the Debtor's financial processing and reporting systems are designed to function within this account structure, which makes it critical that the structure continue uninterrupted post-petition.

34.     Upon information and belief, the Bank is a depository authorized by the office of the United States Trustee ("UST") to maintain debtor-in-possession accounts in the Western District of Kentucky.

35.     Given its historical relationship with the Debtor and related institutional knowledge, the Debtor intends to open at least two debtor-in-possession accounts at the Bank (the "DIP Accounts"). One of the DIP Accounts will serve as the Debtor's general operating account ("DIP Operating Account"), which will replace the Pre-Petition Sweep Account, and the other will serve as a tax account ("DIP Tax Account").

6

4430139.1

36.     By the Cash Management Motion, the Debtor seeks permission to leave the pre-petition Restaurant Accounts open on the following conditions:

    a. No payments or disbursements will be made from the Restaurant Accounts; and

    b. All funds in the Restaurant Accounts will be swept into the DIP Operating Account no less frequently than every 72 hours.

37.     Funds necessary to pay taxes will be transferred from the DIP Operating Account to the DIP Tax Account, as needed.

38.     Closing all of the Restaurant Accounts, and opening replacement debtor-in-possession accounts would be a herculean task that would inevitably interrupt the Debtor's receipt of cash from some of the Restaurants.

39.     Any material disruption in the Debtor's receipt of cash could materially harm the Debtor's operations and prospects for reorganization.

**Pertinent Facts Relating to the Wage Motion**

40.     As of the Petition Date, the Debtor had approximately 850 employees that are directly employed by the Debtor. Additionally, twelve of the Debtor's regional managers and other above-store level employees are employees of Stella Solutions, LLC ("Stella")[2] but are paid by the Debtor. Further, two of the Debtor's C-Suite personnel are employed by Stella but their salaries are shared, 50-50, between the Debtor and Starcorp, LLC and/or Starcorp HD, LLC (collectively, "Starcorp"), the seller of the Restaurants. Finally, one employee, Luis Ibanez, is employed by Starcorp but a portion of his wages is paid by the Debtor because Mr. Ibanez performs work for the Debtor. Each of these employees are referred to herein as the

---

[2] The Debtor's principals, Brian Bonfiglio and John Kirchhefer hold membership interests in Stella.

4430139.1

"Employees."

41.     A schedule identifying the Employees and showing the amount of payment to which each is estimated to be entitled in connection with his or her pre-petition employment is attached to the Wage Motion as Exhibit "A."

42.     The Debtor's payroll system is based upon bi-weekly

43.     The Debtor last paid its employees on July 6, 2026 for the period from June 16, 2026 through June 29, 2026.

44.     In the ordinary course of the Debtor's business, the Debtor's next payroll will occur on or about July 20, 2026, and provide compensation for services rendered from June 30, 2026 through July 13, 2026.

45.     A third-party payroll service provider, ADP, Inc. (the "PEO"), provides all payroll-related functions for the Debtor, including the withholding and payment of payroll taxes, and all payroll funds are paid to the Employees from funds disbursed by the Debtor to the PEO.

46.     As part of their compensation, and in accordance with applicable law and the Debtor's established policies, the Employees also accrue paid vacation and/or sick time off ("PTO").

47.     PTO is only honored on an ongoing basis, and, unless otherwise required by law, is not redeemable for cash.

48.     In addition to PTO, the Debtor pays some or all of the health insurance premiums for certain of the Employees (but not their respective family members).

49.     As of the Petition Date, there existed approximately $483,000 in earned but unpaid wages owing to the Employees for the pre-petition period from June 30, 2026 through

8

4430139.1

July 8, 2026. *See* Exhibit A to the Wage Motion.

50.     None of the wages subject to the Wage Motion are payable to insiders of the Debtor.

51.     As of the Petition Date, some paychecks to Employees may not have been cashed and/or may not have cleared the Debtor's pre-petition bank account.

52.     The greatest amount of gross earned pre-petition wages due to any Employee is approximately $3,800.

53.     As of the Petition Date, the Employees had accrued PTO in the ordinary course of the Debtor's operations.

54.     The Debtor believes that if the Employees are not promptly and fully paid for their pre-petition employment, or their pre-petition benefits are not otherwise honored, a meaningful number of Employees will terminate their employment, and that any such termination would materially harm the Debtor's operations and reorganization efforts.

**Pertinent Facts Relating to the Critical Vendor Motion**

55.     In the ordinary course of its business, the Debtor utilizes various vendors to provide food, goods and services that are critical to the Debtor's operations ("Critical Vendors").

56.     For example, some of the Debtor's vendors provide specific goods and/or services that are expressly required and mandated to be used by the Franchisor in connection with the Debtor's operations of the Restaurants. Some of these vendors have pre-petition claims against the Debtor for food, goods or services supplied pre-petition and will likely not provide mandated food, goods or services to the Debtor post-petition with such outstanding amounts due.

9

57.    Some of these vendors provide critical repair and maintenance services to rural stores where alternative repair and maintenance services are otherwise unavailable. Without these scarce and valuable repair and maintenance services, the Debtor's operations will suffer.

58.    Additionally, the Debtor also requires services from a variety of utilities for the operation of the Restaurants.

59.    Attached to the Critical Vendors Motion as Exhibit "A" ("Critical Vendor List") is a schedule showing the Critical Vendors (including utilities), the goods and/or services that each provides, and the amount that each is owed on account of prepetition goods and services provided.

60.    All but approximately $117,000 of the Critical Vendor claims are, essentially, current through approximately 30 days prior to the Petition Date. Accordingly, the Debtor intends to continue paying these pre-petition Critical Vendors' claims in the ordinary course of the Debtor's business and such claims are reflected in the Debtor's proposed cash collateral Budget.

61.    Of the total amount of Critical Vendor claims identified in the Critical Vendor List, only approximately $117,000 is over 30 days old.  The Debtor intends to pay those older Critical Vendor claims over time through payments aggregating approximately $11,000 per month, and has included those payments in its proposed cash collateral Budget.

62.    One of the Critical Vendors, McLane Foodservice ("McLane"), supplies a substantial amount of the food to the Debtor's Restaurants. McLane holds a deposit in the amount of approximately $400,000 and is owed approximately $546,000 for pre-petition goods provided to the Debtor.

63.    McLane may have received payments from the Debtor for goods supplied by

McLane pre-petition which were not fully processed prior to the Petition Date. To the extent that McLane processed any such payments post-petition, the Debtor requests that such payments be approved as authorized critical vendor payments, retroactively.

64.     The Debtor also uses an outside book-keeping and accounting service, XB Franchise Solutions, LLC ("XB"), to prepare financial information on a periodic basis that is required by the Franchisor and for other operational purposes. The Debtor does not believe that any pre-petition amounts are due to XB.

65.     The Debtor's principals, Brian Bonfiglio and John Kirchhefer hold membership interests in XB; however, neither of them are involved in the operations or management of XB

66.     It is critical that the Debtor remain current on its obligations to the Critical Vendors so as to minimize the possibility of any disruption to the Debtor's operations.

67.     The process of identifying the Critical Vendors was undertaken by the Debtor's senior management.

68.     Only vendors that met one or more of the following criteria were designated as Critical Vendors:

        a.     Vendors who are required by the Franchisor;

        b.     Vendors whose products or services are critical to the Debtor's business operations and essential to reorganization, including utility providers;

        c.     Vendors for whom there is no ready replacement supplier of similar goods or services at comparable prices;

        d.     Vendors whose replacement would entail significant delay and expense; and

11

4430139.1

e.    Vendors who would likely refuse to continue to provide services post-petition without payment of their outstanding invoices.

69.    Of the numerous vendors used by the Debtor, only 28 (not counting utilities) have been designated as Critical Vendors, the payment of whom is sought by the Critical Vendor Motion.

70.    As demonstrated by the Critical Vendor List, the Debtor estimates that as of the Petition Date, a total of only approximately $903,065 (the "Required Amount") was owed to the Critical Vendors (approximately $101,000 of which relates to utilities) and is sought to be paid pursuant to the Critical Vendor Motion. By comparison, the normal monthly expenses for the Restaurants (not including debt service) average approximately $4.5 million per month.

71.    The Debtor submits that if the Critical Vendors are not promptly paid the Required Amount on account of their pre-petition claims, there would be a material negative impact on the Debtor's operations and potentially on its prospects for a successful reorganization.

72.    Furthermore, the Debtor submits that the use of revenues that may be determined to be cash collateral to pay the Required Amount to the Critical Vendors is appropriate as the payments to the Critical Vendors, just as the payment of other ordinary course expenses, will preserve and protect the collateral of any secured party asserting an interest in such revenues.

**Pertinent Facts Relating to the Utilities Motion**

73.    In the course of its business, the Debtor receives electricity, water, gas, internet, waste disposal and other services from certain utility companies (the "Utilities"). A list of all

12

of the Debtor's utility accounts is attached to the Utilities Motion as Exhibit "A" and is incorporated herein by this reference.

74.     Some of the Utilities are currently in the name of the seller who sold the Restaurants to the Debtor. The Debtor is in the process of moving those Utilities to its name.

75.     Pre-petition, the Debtor was generally current on its payments to the Utilities. In fact, the pre-petition amounts due to the Utilities (if any) represent only one payment cycle that was not paid due to the filing of the Debtor's bankruptcy petition.

76.     As of the Petition Date, certain of the Utilities held monetary deposits provided by the Debtor.

77.     The services provided by the Utilities are essential to the Debtor's operations and reorganization efforts.

78.     Any disruption in the provision of utility service would significantly harm the Debtor's ability to generate revenue and/or proceeds from the sale of portions of the Debtor's business, and, therefore, their prospects for reorganization.

**Pertinent Facts Relating to the Lease Rejection Motion**

79.     As mentioned, the Debtor closed several stores prior to the Petition Date and, while some of the leases and related franchise agreements were terminated pre-petition, the Debtor continues to make payments (*i.e.* the "dark site" expenses) relating to those closed restaurants pursuant to agreements between the Debtor and the former landlord and/or the franchisor with respect to certain of those closed locations (collectively, the "Rejected Leases"). The Rejected Leases are identified in Exhibit "A" to the Lease Rejection Motion.

80.     The Rejected Leases, and the payment of the "dark site" expenses are of no benefit to, but are a substantial burden on, the Debtor's estate because such locations have

4430139.1

been permanently closed and do not generate revenue for the Debtor.

81.     The Debtor has, therefore, determined that the Rejected Leases should be rejected. The Debtor submits that the rejection of the Rejected Leases is a reasonable exercise of their sound business judgment and is in the best interests of their bankruptcy estates and creditors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED:   July 13, 2026

/s/ Brian Bonfiglio
Brian Bonfiglio

4430139.1

## Certificate of Service

I hereby certify that on July 14, 2026, a copy of the foregoing *Declaration of Brian Bonfiglio in Support of First Day Motions* was filed electronically. Notice of this filing will be sent to the United States Trustee and all other parties having entered an appearance in this case through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

/s/ Tyler R. Yeager
CHARITY S. BIRD
TYLER R. YEAGER

4430139.1